**Joseph HABURJAK, Plaintiff,**

v.

**PRUDENTIAL BACHE SECURITIES, INC., Defendant.**

**No. C–C–90–75–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 8, 1991.

**294**

Gregory Bartko, Reynolds Bryant & Patterson, Raleigh, N.C., for plaintiff.

John R. Wester, D. Blaine Sanders, Robinson Bradshaw & Hinson, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's motions for summary judgment on Defendant's counterclaim and Plaintiff's complaint.

## I. FACTUAL BACKGROUND.

The record in this case indicates that the dispute in this matter involves the termination of Plaintiff by Defendant. In February, 1988, Defendant extended an offer for Plaintiff to leave his position as a stock broker with Paine Webber in Charlotte, North Carolina to join its office in the same city. Defendant is a Delaware corporation with its principal place of business in New York. Plaintiff is and has been during the period of time relevant to this litigation a citizen of North Carolina.

As an enticement for Plaintiff to leave his position with Paine Webber, Defendant offered Plaintiff transition pay in the amount of $155,924.00.[1] This sum was paid to Plaintiff in a lump sum on his first day of work (February 12, 1988) at Defendant's firm. Plaintiff signed a note on February 12, 1988 for the full amount of the payment. The note provides that Plaintiff was to repay the transition pay in equal installments over the course of four (4) years. Moreover, the note contains an acceleration clause with the effect of making the entire amount of the loan due immediately for, among other reasons, the termination of Plaintiff "for any reason whatsoever". However, the employment agreement signed by Plaintiff also on February 12, 1988 contains language that seems to impose liability on Plaintiff to repay the note only in the event that termination was for cause.

Plaintiff worked for Defendant without complaint until September, 1989. On September 29, 1989, Defendant terminated Plaintiff from its employ. Defendant claimed that Plaintiff had been trading extensively in accounts for customers he knew had died well before he began such trading. When confronted with the accusations, Plaintiff claimed that Defendant's operation department had opened the accounts and had full knowledge of his activities. Moreover, Plaintiff contended that the account of which he had been trading was of a customer that had recently died, and that the customer's sister as executor of the customer's estate had authorized the trading. Plaintiff further claimed that the accounts had made money for the customer's estate and that no one had complained about his activities. Plaintiff contended that any error on his part in trading on those accounts was clerical in nature, and certainly not an offense amounting to termination for cause. After being discharged, Plaintiff has claimed that the real reason for the termination was that he discovered widespread insider trading was being conducted by employees of Defen-

1. Transition pay is a normal inducement utilized in the brokerage business which is offered to lure established brokers and their clients away from other firms. Brokers are ordinarily compensated on a commission basis. When a broker switches firms, there are delays experienced due to transferring existing clients' assets to the new firm, thereby reducing the broker's normal commission income temporarily. The transition pay compensates for the temporary commission loss.

dant with the tacit approval of the manager of Defendant's Charlotte office.

Defendant nonetheless fired Plaintiff. Defendant believed that Plaintiff's actions justified discharge for cause in that the actions were dishonest, a violation of regulatory rules, a violation of Defendant's internal policy and detrimental to the conduct of Defendant's business.

In response to his termination, Plaintiff filed the complaint and amended complaint in this action. Count I alleges that Plaintiff informed Defendant's manager that insider trading was being conducted in its office, and that Plaintiff was discharged for this reason in violation of his employment agreement. Count II alleges that such retaliatory action is violative of North Carolina and federal public policy. Count III alleges that Defendant intentionally failed to file a form U–5 within thirty (30) days of Plaintiff's termination in violation of regulations promulgated by the National Association of Securities Dealers (NASD). Count IV alleges that Defendant's agents slandered and defamed Plaintiff's reputation in conversations with his former customers. Count V alleges that Defendant's actions amounted to the intentional infliction of emotional distress. And Count VI from the amended complaint alleges that Defendant withheld wages in the amount of $1,163.00 in violation of state law.

After answering the complaint, Defendant filed a counterclaim against Plaintiff. The counterclaim alleges that Plaintiff was obligated under the note to repay in full the transition pay when he was terminated. Defendant claims that Plaintiff is indebted to it in the amount of $116,943.00.[2]

## II. PROCEDURAL BACKGROUND.

The complaint in this matter, alleging five (5) causes of action, was filed on Feb-

ruary 23, 1990 in the Mecklenburg County, North Carolina Superior Court. On March 13, 1990, Defendant filed a notice removing the matter to this Court based on the diversity of the parties' citizenship. Through the random assignment of case procedure utilized by the Clerk's office, the case was assigned to the Honorable James B. McMillan.

On March 19, 1990, Defendant filed its answer to Plaintiff's complaint. Plaintiff, on April 9, 1990, filed a reply to Defendant's counterclaim. On June 29, 1990, Plaintiff moved to amend the complaint to add a sixth claim. That motion was granted by Judge McMillan on July 19, 1990. On August 2, 1990, Defendant filed its answer to the amended complaint. In October, 1990, this matter was reassigned to the undersigned. Consequently, a superseding pretrial order was entered on October 22, 1990.

On June 1, 1990, Defendant filed a motion for summary judgment on its counterclaim. However, the motion was not briefed as required by the superseding pretrial order because Judge McMillan's pretrial order did not contain such a requirement. Plaintiff, on June 27, 1990, filed a memorandum in opposition to Defendant's motion for summary judgment on the counterclaim. After this matter had been reassigned to the undersigned, Defendant filed a document captioned "Defendant's Reply in Support of Motion for Summary Judgment on Counterclaim". In essence, the document was a brief in support of Defendant's motion for summary judgment on the counterclaim. The undersigned, through the Clerk's office, requested that the document be filed in order for Defendant to be in compliance with this Court's requirement that all motions be briefed. *See* Pretrial Order, filed October 22, 1990, at par. 7 on page 3 (stating that every

---

**2.** Plaintiff states in his affidavit that he was told by Defendant's manager that he would be required to pay four (4) annual installments of $38,981.00 toward the transition pay. However, Plaintiff states that he was led to believe by Defendant's manager that it was customary for the loan to be forgiven at the rate of $38,981.00 per year. In support of this belief, Plaintiff states on his first year anniversary of employ-

ment at Defendant's firm, Plaintiff issued to Defendant a check in the amount of $54,573.40 which represented principal of $38,931.00 and accrued interest of $15,592,40. Simultaneously, Defendant issued to Plaintiff a check in the gross amount of $54,573.40 minus deductions of $19,296.67 with a net amount of $35,276.73. Plaintiff claims that the net payment represents a forgiveness of the first year payment.

motion must be accompanied by brief and that if motion filed before entry of pretrial order, moving counsel must file brief within 14 days of the filing date of order).

Plaintiff on November 13, 1990 filed a motion to strike Defendant's reply in support of its motion for summary judgment on the counterclaim. In support of the motion, Plaintiff cited to the undersigned's pretrial order requirement that reply memorandum be submitted within 14 days (plus 3 days if service is made by mail) from the service of the preceding document. *See* Pretrial Order, dated October 22, 1990, at paragraph 12 on page 4. Because the reply was filed some four (4) months after Plaintiff's response was filed, Plaintiff contends that Defendant violated the Court's pretrial order and that striking the reply is justified.

On November 14, 1990, Defendant filed a response to Plaintiff' motion to strike its reply brief. Defendant cited the language of paragraph 7 of the pretrial order which allows a party 14 days from the order being entered to bring the motion into compliance. Because the pretrial order was entered on October 22, 1990 and Plaintiff filed its reply/brief on November 5, 1990, Plaintiff argues that the reply (which should have been captioned as a brief) was timely filed. Plaintiff, on November 21, 1990, filed a reply to Defendant's response to it motion to strike the reply brief, and Defendant on November 29, 1990 filed a surreply to that reply.

The Court believes that Defendant's reply of November 5, 1990 was in essence a brief in support of its motion for summary judgment of the counterclaim. Accordingly, the reply/brief was timely filed. Moreover, the Court doubts the wisdom in deciding issues based on a hypertechnical reading of the Court's pretrial order rather than on the merits. Therefore, the Court will deny Plaintiff's motion to strike the reply.

On December 7, 1990, Defendant filed a motion for summary judgment as to each of the six (6) causes of action in Plaintiff's complaint and amended complaint. Defendant attached affidavits and deposition tes-

timony in support of its motion. On December 21, 1990, Plaintiff filed a memorandum in opposition to Defendant's motion for summary judgment. Plaintiff attached affidavits and deposition testimony in support of his memorandum in opposition. On January 2, 1991, Defendant filed a reply brief in support of its motion for summary judgment. Plaintiff on January 16, 1991 filed a surreply memorandum in opposition to Defendant's motion for summary judgment. On January 22, 1991, Defendant filed a second reply brief in support of its motion for summary judgment.

With the issues having been briefed ad nauseam, the Court believes that the motions for summary judgment are now ripe for disposition.

## III. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c) of the Federal Rules of Civil Procedure. The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts

and inferences from the facts in the light most favorable to the party opposing the motion for summary judgment. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM.

■ In support of its motion for summary judgment on the counterclaim, Defendant contends that the note itself requires Plaintiff to pay the outstanding balance of the note if Plaintiff is terminated for any reason whatsoever. The relevant language from the note on page 1 provides in pertinent part:

> ... [T]his Note, plus interest, shall at the option of P–B Securities become immediately due and payable without notice, protest, presentment, or demand upon the happening of any one of the following specified events of default:
>
> (1) *the termination, for any reason whatsoever, of the undersigned's employment with P–B Securities* ... (emphasis added).

Moreover, Plaintiff has admitted to signing, reading and understanding the terms of the note. *See* Defendant's Request for Admissions numbers 11–15. Because there are no material issues in dispute as to Plaintiff's obligation under the note, Defendant argues that summary judgment is appropriate.

In response, Plaintiff has cited to language from the employment agreement. The employment agreement, entered on February 12, 1988 (the same day as the note), provides in pertinent part:

> 5. *Transitional Compensation.* P–B Securities shall pay you total transitional compensation of ONE HUNDRED FIFTY–FIVE THOUSAND, NINE HUNDRED TWENTY–FOUR DOLLARS ($155,924.00) in four equal annual installments on February 12, 1989, 1990, 1991, and 1992.... Each such installment shall be subject to applicable withholding taxes on said amount and interest paid thereon and shall be paid to you provided that ... (b) *you have not been terminated for cause as defined in paragraph 3(c) hereof....* If you resign for any reason before completing four years of employment or are terminated for cause, you will not be entitled to any unpaid amounts under this paragraph.... *If you are terminated by P–B Securities without cause as defined herein, all unpaid installments (less withholding taxes) due to you hereunder shall be accelerated and any amounts owed by you to P–B Securities shall be accelerated* ... (emphasis added).

The terms of the employment agreement indicate that Plaintiff is not liable for transitional pay if termination was without cause. In fact, had Defendant not paid the transitional compensation in a lump sum, it would owe Plaintiff the entire amount if Plaintiff was discharged without cause. Hence, it appears to the Court that the terms of the note and the employment agreement regarding the transitional payment are in conflict. Thus, both agreements must be construed together in determining what the parties intended. *See Lambe–Young, Inc. v. Austin,* 75 N.C.App. 569, 331 S.E.2d 293, 295 (1985). When the documents are construed together, it becomes immediately apparent that material facts are in dispute; namely, whether the agreement between the parties anticipated whether the transitional compensation would be due only if Plaintiff was discharged for cause and then whether Plaintiff was in fact discharged for cause.

Defendant in its brief in support of the motion for summary judgment on the counterclaim appears to concede that there might be a material issue in dispute regarding the terms of the agreement. Accordingly, for purposes of the motion, Defendant accedes that in order to be entitled to collect on its note it must show Plaintiff was discharged for cause. Defendant ar-

gues, however, that Plaintiff's evidence regarding alleged instances of insider trading and his subsequent reporting of such activities is too speculative to survive a motion for summary judgment.

The Court believes that genuine issues of material fact are in dispute regarding whether Plaintiff was terminated for cause. Defendant as the movant has the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, all inferences of fact must be taken in a light most favorable to Plaintiff as the non-movant. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although it is not the most convincing evidence, the Court believes that Plaintiff has come forward with evidence that he learned of insider trading activities at Defendant's Charlotte office; that Plaintiff confronted Defendant's manager with his knowledge of the activities; and that Defendant's manager appeared to acknowledge his awareness of such activity. The evidence of Plaintiff being terminated for "blowing the whistle" is supported by the closeness of time to the discharge and the conversation between Plaintiff and Defendant's manager. Moreover, other unrelated lawsuits involving alleged insider trading by employees of Defendant are currently pending.

Even if Plaintiff has not presented sufficient evidence to survive the summary judgment motion based on the theory that he was terminated for his knowledge of the alleged insider trading activities, the Court nonetheless believes that genuine issues of material fact are in dispute regarding whether the instances of Plaintiff trading on the account of deceased persons amounts to activities that are defined in the employment agreement as giving rise to "for cause" terminable offenses. Plaintiff has presented evidence that Defendant's operations department was aware and approved of the activities. Moreover, Plaintiff has presented evidence that the trading may have been a technical or clerical error instead of dishonesty. Finally, Plaintiff

has presented evidence that appears to indicate that he had the approval of the executor of the deceased customer's estate to trade on the account.

While the Court does not necessarily believe that the evidence presented by Plaintiff is compelling, the Court does believe that it is the function of a jury as the fact finder to make the determination of whether the evidence is convincing. Accordingly, the Court will deny Defendant's motion for summary judgment on its counterclaim.

## V. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE COMPLAINT.

Defendant has moved for summary judgment on each of the six (6) counts pleaded by Plaintiff. The Court will address each count below.

### A. Count I—Discharge in Violation of the Employment Agreement.

In the first count of his complaint, Plaintiff contends that Defendant discharged him in retaliation for his discovery of insider trading by employees of Defendant. According to Plaintiff, such a termination was violative of his employment agreement with Defendant.

The agreement at paragraphs 3, 15, and 16 provides in pertinent part:

3. *Term.* . . . Your employment shall commence on the date hereof and will terminate on the earliest of the following . . . (b) Written of oral notice of termination from either party to this Agreement to the other.

15. *Duration of Employment.* This Agreement does not guarantee the Employee any particular term of employment. *Employee is employed at will and may be terminated at any time with or without cause.* (emphasis added).

16. *Applicable Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Defendant argues that the explicit terms of the agreement provided that Plaintiff was employed at will. Accordingly, Defen-

dant contends that Plaintiff is without a cause of action for violation of the agreement since the agreement provided that he could be terminated at any time, with or without cause. Moreover, Defendant has cited a New York case in which summary judgment was upheld where an employee was discharged for reporting accounting improprieties. *See Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (1983). The Court of Appeals emphasized New York's "[l]ong settled rule that where an employment is for an indefinite term it is presumed to be a hiring at-will which may be freely terminated by either party at any time for any reason or even for no reason." *Id.* 461 N.Y.S.2d at 235, 448 N.E.2d at 89.[3]

The Court believes that Plaintiff has failed to provide any evidence to contradict Defendant's position that he was employed at will. Plaintiff certainly has not produced any evidence indicating that the parties did not bargain for something different than what the agreement says—that Plaintiff could be terminated at any time for any reason. Plaintiff's arguments that Defendant violated public policy by discharging him are relevant to Count II alone. Plaintiff, in his memorandum of December 21, 1990 in opposition to Defendant's motion for summary judgment, states at page 23 that the "[c]laim for wrongful discharge in North Carolina sounds in tort". Therefore, the arguments that Plaintiff was terminated for disclosing information related to insider trading is relevant for the tort cause of action in Count II.

Because Plaintiff has not produced any evidence to rebut the contention of Defendant that the agreement provided for at-will employment, Defendant's motion for summary judgment on Count I will be granted.

B. *Count II—Wrongful Discharge in Violation of Public Policy.*

■ The employment at-will doctrine is firmly entrenched in North Carolina law. Recently, the North Carolina Supreme Court has enunciated an exception to the doctrine where a discharge is made in violation of public policy. *See Coman v. Thomas Manufacturing Co., Inc.*, 325 N.C. 172, 381 S.E.2d 445 (1989). In the *Coman* case, the plaintiff, Mark Coman, was employed by the defendant as a truck driver. Federal regulation prohibits a driver from operating his truck for more than a ten hour shift. Drivers are also required to keep accurate logs of the hours that the truck is driven. The defendant in *Coman*, contrary to federal law, requested that Coman and other drivers operate their trucks in excess of ten hour shifts. Coman was also instructed to falsify the log in his truck. When Coman refused to comply with these requests, he was fired by the defendant.

In finding an exception to the employment at-will doctrine, the North Carolina Supreme Court relied on the North Carolina Court of Appeals case of *Sides v. Duke University*, 74 N.C.App. 331, 328 S.E.2d 818, *disc. rev. denied*, 314 N.C. 331, 333 S.E.2d 490 (1985). In that case, Sides, an employee at will, was discharged when she refused to perjure herself. The North Carolina Supreme Court found that the *Coman* case came within the reasoning of *Sides*. Both involved the violation of law contrary to public policy. *See Coman*, 381 S.E.2d at 447. The court in *Coman* went on to list the particular statutes governing the operation of motor vehicles within the state. *Id.* Moreover, the court then noted that Coman was faced with the dilemma of violating the public policy as reflected in statutes governing the operation of motor vehicles within the state and risking imprisonment, or complying with the public policy and being fired from his employment. *Id.* The court found that the best interest of the state is served by encouraging employers to refrain from violating the public policy by providing terminated employees with a remedy. *Id.* at 447–48.

---

**3.** As to Count I only, the Court believes New York law is applicable. This claim relates directly to the employment agreement. Both parties bargained in good faith for the agreement to be interpreted by New York. The Court (as is discussed *infra.*) believes that the remaining claims are tortious in nature and do not relate to a breach of the agreement. Accordingly, North Carolina law is applicable to those claims.

A clearly delineated exception to the employment at-will doctrine would have been created had the court stopped at this point; namely, that when an employer compels an employee to violate the law and terminates the employee for refusing to do so, the employee has a cause of action for the tort of wrongful discharge. However, in language that this Court believes is dicta to the opinion, the North Carolina Supreme Court stated, "[B]ad faith conduct should not be tolerated in employment relations, just as it is not accepted in other commercial relationships." *Id.* at 448. The court failed to define "bad faith", and thus left unanswered the scope of the exception. As one commentator has noted, "[t]he Supreme Court of North Carolina has created an overly broad public policy exception and bad faith exception that will encourage numerous plaintiff-employee lawsuits and increase the cost of doing business to employers." *See* Alford, *Coman v. Thomas Manufacturing Co.: Recognizing a Public Policy Exception to the At–Will Employment Doctrine,* 68 N.C.L.R. 1178, 1178 (1990).

The only North Carolina Court of Appeals case to significantly examine the scope of *Coman* has stated that:

> The two North Carolina cases which have used public-policy grounds to find exceptions to the at-will doctrine have involved allegations of the employee's being *affirmatively instructed to violate the law.* In each case, our courts focused on the potential harm to the public at large if those instructions were obeyed.

*See McLaughlin v. Barclays American Corp.,* 95 N.C.App. 301, 382 S.E.2d 836, 839–40 (1989). Although the court in *McLaughlin* did not specifically hold that the public policy exception to the employment at-will doctrine is limited to those instances in which an employer "affirmatively instructs (an employee) to violate the law", this Court believes that the court intended to limit the use of the exception to those circumstances. *Id.*

Similarly, the Fourth Circuit Court of Appeals in a recent case has also stated that the breadth of the *Coman* exception is presently unclear and will remain so until state courts have an opportunity to apply *Coman* to a variety of cases. *See Harrison v. Edison Brothers Apparel Stores, Inc.,* 924 F.2d 530, 533–34 (4th Cir.1991) (published op.). Nonetheless, the Court reversed the district court's decision to grant summary judgment on a *Coman* claim where the plaintiff alleged that her supervisor made sexually suggestive remarks to her, touched her without her consent, and requested sex. *Id.* at 531. In limiting the exception, the Fourth Circuit found that the supervisor's conduct amounted to a solicitation of prostitution in violation of state law from the plaintiff. *Id.* at 533–34. Because the plaintiff was fired for refusing to violate the North Carolina prostitution statute, the Fourth Circuit found that her complaint stated an actionable claim for wrongful discharge. *Id.* at 534.

In the case at hand, Plaintiff argues that the exception should include instances where an employee refuses to perform an act prohibited by law or where an employee performs an act required by law. *See Hogan v. Forsyth Country Club,* 79 N.C.App. 483, 498, 340 S.E.2d 116 (1986); *but see* Alford, 68 N.C.L.R. at 1185 (indicating that in *Hogan,* language stating that public policy exception applies when employee performs an act required by law was dictum and that the court nor any court since relied on that provision). Since brokers are required to disclose the existence of insider trading, Plaintiff argues that his termination for doing what the law requires is within the *Coman* exception.

This Court will not be the court to extend the *Coman* exception further. In one sense, the Court believes the broad language of *Coman* relating to "bad faith" is unfortunate and destined to lead to the inclusion of a wrongful discharge claim to virtually every employment termination lawsuit. The Court finds it implausible that the North Carolina Supreme Court, in enunciating a limited exception to the well entrenched employment at-will doctrine, intended to create a separate cause of action to almost every employment termination case. Just as the Fourth Circuit has done in *Harrison,* this Court will allow the state

courts to determine the breadth of the exception. In the meantime, this Court adopts the holding of *McLaughlin* that the public policy exception to the employment at-will doctrine is limited to those instances in which an employer affirmatively instructs an employee to violate the law. Because Plaintiff has failed to introduce any evidence that Defendant instructed him to violate the law, summary judgment on this claim will be granted.[4]

### C. *Count III—Tardy Filing of NASD Form U-5.*

■ In his complaint, Plaintiff contends in Count III that Defendant violated NASD rules by failing to file the form U-5 in a timely fashion. NASD regulation requires that members give notice through a form U-5 of a broker's termination within thirty (30) days. A copy of the notice is also to be given to the terminated broker.

Defendant has introduced evidence through the affidavit of Bruce Karp that it filed Plaintiff's U-5 form on October 27, 1989. Thus, the form was filed within thirty (30) days of Plaintiff's termination date of September 29, 1989. Moreover, the affiant stated that a copy of the form was sent to Plaintiff on the same date.

Plaintiff has introduced absolutely no evidence to counter the affidavit of Bruce Karp. In fact, Plaintiff failed to address Count III in the memorandum in opposition. Moreover, the Court does not believe that there is any basis in law for a cause of action based on the alleged violation of a NASD regulation. *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 679-80 (9th

Cir.1980). Therefore, the Court will grant Defendant's motion for summary judgment on Count III.

### D. *Count IV—Slander.*

■ In support of his fourth claim, Plaintiff has introduced the affidavits of William Franck—a former customer of Plaintiff while he worked for Defendant—and Kenneth Hester—the accountant of Franck.[5] The affidavits indicate that after Plaintiff was terminated, Franck was contacted by Defendant's broker Dick Jarman. Jarman represented to Franck that his account had been reassigned to him following the termination of Plaintiff. Jarman also inferred that this was not the first time Plaintiff had been terminated from a brokerage firm. Furthermore, Jarman created the impression that Plaintiff was involved in insider trading and that he had received "kickbacks" from Hester's accounting firm.

■ Defendant argues that the slander claim cannot be imputed to it because Jarman was not acting within the scope of his employment. In the alternative, Defendant contends that the comment was qualifiedly privileged.

The Court believes the question of whether the statement was in the scope of Jarman's employment is a question of fact that must be decided by the jury. It is disingenuous for Defendant to argue that it was not in Jarman's job description to make slanderous statements. If the Court was to adopt this argument, a principal could never be held liable for its agents'

---

4. Plaintiff does not claim that Defendant instructed him to violate the law or that his refusal to do so resulted in his termination. Moreover, Plaintiff admits that no one at Defendant's firm told him to withhold information or to disclose information he believed to be false. *See* Haburjak Dep. at 135–37. Rather, Plaintiff's sole claim is that he received no response from Defendant's manager when he reported that insider trading was being conducted. *See* Haburjak Dep. at 181–82. Had Plaintiff been affirmatively instructed to withhold information, the Court believes that he would have a cause of action on this claim. However, the evidence does not support such a scenario.

5. Based on Plaintiff's attempt to impose a hypertechnical reading on the Court's pretrial order as discussed *supra.* in relation to Defendant's reply/brief in support of its motion for summary judgment on the counterclaim, the Court is tempted to strike the affidavits of Franck and Hester. This Court has a long-standing rule of which Plaintiff's counsel should be well aware that prohibits filing faxed documents. The Franck affidavit and the affidavit of Hester (which corroborates Franck's affidavit) are both faxed copies. However, the Court is more concerned with deciding issues based on the merits rather than expounding wasteful effort and resources in interpreting the pretrial order in the petty manner suggested by Plaintiff.

actions.[6] The Court believes that a reasonable jury could determine that Jarman in his job as a broker attempting to obtain additional business for Defendant chose to make slanderous statements against Plaintiff in an attempt to damage Plaintiff's reputation in the brokerage business.

As to the argument that any statement by Jarman was qualified privilege, Defendant must demonstrate that the statements to former clients of Plaintiff were made in good faith in rendering investment advice. *See Stewart v. Nation–Wide Check Corp.*, 279 N.C. 278, 285, 182 S.E.2d 410, 415 (1971). The determination of whether the statements were made in good faith requires a subjective inspection of Jarman's motivation. The Court believes that such an inspection is an area reserved for the jury.

Based on the reasons enunciated heretofore, the Court believes that there are genuine issues of material fact in dispute in regard to Count IV. Accordingly, summary judgment is not appropriate on this cause of action.

### E. Count V—Intentional Infliction of Emotional Distress.

■ In support of his fifth cause of action, Plaintiff contends that Defendant terminated him with "[t]he purpose and intent of obtaining his client base which he developed over seven (7) years in the brokerage business to its own financial benefit and to his financial ruin." *See* Plaintiff's Memorandum in Opposition, filed December 21, 1990, at 32. Defendant's actions has caused Plaintiff sleeplessness, nervousness, humiliation, and embarrassment. Moreover, Plaintiff claims that he has been clinically diagnosed and treated for anxiety. According to Plaintiff, the actions of Defendant constitute the tort of intentional infliction of emotional distress.

Defendant believes that Plaintiff has failed to establish that its behavior amounts to "extreme and outrageous conduct". Moreover, Defendant has introduced Plaintiff's deposition testimony which tends to indicate that Plaintiff's emotional distress was a preexisting condition. For example, Plaintiff has admitted that he was treated for hypertension, obesity and stress nine months before his termination. *See* Haburjak Dep. at 49–50. Plaintiff has not sought professional or pastoral psychiatric treatment for emotional distress. *Id.* at 59–60. Moreover, Plaintiff admitted to being a "pack and a half" a day smoker which contributes to elevated blood pressure. *Id.* at 257–58.

In North Carolina, the elements of intentional infliction of emotional distress are as follows:

(1) Extreme and outrageous conduct

(2) which is intended to cause and does cause

(3) severe emotional distress to another. *See Trought v. Richardson*, 78 N.C.App. 758, 338 S.E.2d 617, 620, *review denied*, 316 N.C. 557, 344 S.E.2d 18 (1986). Only when the conduct "exceeds all bounds usually tolerated by decent society" and the conduct "causes mental distress of a very serious kind" will liability be imposed on the defendant for the tort. *Id.* (quoting *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979)). Summary judgment is appropriate if the plaintiff fails to prove one or more essential elements of the claim. *See Hill v. City of Kinston*, 92 N.C.App. 375, 374 S.E.2d 425 (1988); *Troxler v. Charter Mandala Center, Inc.*, 89 N.C.App. 268, 365 S.E.2d 665, *review denied*, 322 N.C. 838, 371 S.E.2d 284 (1988).

In employment actions, North Carolina courts have been reluctant to find intentional infliction of emotional distress claims actionable. *See generally Mullis v. The Pantry, Inc.*, 93 N.C.App. 591, 378 S.E.2d

---

**6.** In making this argument, Defendant relies on the following analogy. "It is one thing for a principal *to foresee and expect that the agent's* negligent driving of the principal's truck will leave the principal liable for an accident; it is quite another for a principal to foresee or expect that he will be liable for his agent's self-originating, gratuitous slander of a fellow agent". If the Court was to adopt Plaintiff's argument, the principal would never be held liable for an agent's negligent driving of a truck because it is not in the agent's job description to wreck the truck.

578, *review denied*, 325 N.C. 272, 384 S.E.2d 517 (1989); *McKnight v. Simpson's Beauty Supply, Inc.*, 86 N.C.App. 451, 358 S.E.2d 107 (1987); *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 340 S.E.2d 116, *review denied*, 317 N.C. 334, 346 S.E.2d 140 (1986); *Trought*, 338 S.E.2d at 618; *but see Brown v. Burlington Industries, Inc.*, 93 N.C.App. 431, 378 S.E.2d 232 (1989), *review denied*, 326 N.C. 356, 388 S.E.2d 769 (1990). The difficulty in prevailing on a claim of intentional infliction of emotional distress is evident by language found in the Restatement (Second) of Torts, § 46 (comment (d) (1965)):

> The liability clearly does not extend to mere insult,
>
> > indignities, threats.... The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

The Court does not believe that Defendant's conduct in this case arises to the level of outrageousness found by North Carolina courts amounting to liability under the tort. In *Brown v. Burlington Industries, Inc.*, 378 S.E.2d at 232 the evidence showed that the employer's supervisor sexually related remarks and gestures, which were made two to three times a week over an extended period of time, exceeded the bounds tolerated in a decent society. Likewise, the court in *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d at 116 found it outrageous that the plaintiff's supervisor had made sexually suggestive remarks and advances.[7] In *Dickens v. Puryear*, 302 N.C. 437, 447, 276 S.E.2d 325, 332 (1981), the defendants pointed a pistol between the plaintiff's eyes, beat him into semi-consciousness with nightsticks, threatened him with castration, and took votes on whether the plaintiff should be castrated.

At most in this case, Plaintiff lost his job which was governed by an employment agreement that provided for discharge without cause. While Defendant's actions in terminating Plaintiff may have been insensitive or inappropriate, the Court simply does not believe that Plaintiff has introduced credible evidence to indicate that Defendant's conduct was extreme and outrageous. Therefore, the Court will grant Defendant's motion for summary judgment on this claim.

### F. *Count VI—Wage Claim.*

In his amended complaint, Plaintiff claims that Defendant failed to pay him $1,163.00 for wages due. Defendant in its answer to the complaint offered to pay the full amount claimed. However, Plaintiff has rejected that offer in lieu of attempting to convince the Court to award attorneys fees and to double the amount of the award as statutorily permitted.

The only argument offered by Defendant to dismiss this state cause of action is that there will be no independent basis of jurisdiction if the Court grants Defendant's motion for summary judgment on the remaining claims. However, the Court has not dismissed all of the claims. Therefore, the Court does retain jurisdiction over this matter. Thus, summary judgment is not appropriate on Plaintiff's sixth claim.

### VI. ORDER OF THE COURT.

NOW, THEREFORE, IT IS ORDERED that:

(1) Plaintiff's motion to strike Defendant's reply in support of its motion for summary judgment on the counterclaim be, and hereby is, DENIED;

(2) Defendant's motion for summary judgment on its counterclaim be, and hereby is, DENIED; and

(3) Defendant's motion for summary judgment on Plaintiff's complaint is GRANTED AS TO COUNTS I, II, III,

---

7. The conduct included the supervisor brushing up against the employee; rubbing his penis against her buttocks; touching her buttocks; screaming profanities at her when she refused his advances; threatening her with bodily injury; and pulling a knife on her.

Obviously, the conduct in the *Hogan* case was substantially more outrageous than in this case.

and V, and is DENIED AS TO COUNTS IV AND VI.

### JUDGMENT

In accordance with the Memorandum of Decision and Order entered simultaneously with this Judgment,

IT IS ORDERED, ADJUDGED AND DECREED that:

(1) Defendant's motion for summary judgment be, and hereby is, GRANTED AS TO COUNTS I, II, III, and V;

(2) Defendant's motion for summary judgment be, and hereby is, DENIED AS TO COUNTS IV and VI;

(3) Plaintiff's complaint is hereby DISMISSED as to Counts I, II, III, and V; and

(4) Each party shall bear his and its own costs as to Counts I, II, III, and V.